AO 91
Rev. 11/82

**CRIMINAL COMPLAINT**   ORIGINAL

| United States District Court | DISTRICT  CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA  V.  ABRAM EGYZAROV  EUGENE SLUSKER  MARK SERTICH  SAMUEL LEHTZER | DOCKET NO.  MAGISTRATE'S CASE NO.  91- |

Complaint for violation of Title 18, 26   United States Code § 371, 7201

| NAME OF JUDGE OR MAGISTRATE  GEORGE H. KING | OFFICIAL TITLE  UNITED STATES MAGISTRATE JUDGE | LOCATION  Los Angeles, CA |
|---|---|---|
| DATE OF OFFENSE  ———— | PLACE OF OFFENSE  Los Angeles County | ADDRESS OF ACCUSED (If known) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

SEE ATTACHED EXHIBIT A

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge.

SIGNATURE OF COMPLAINANT (official title)
DENETA JACKSON
OFFICIAL TITLE
Special Agent - IRS

Sworn to before me and subscribed in my presence,

SIGNATURE OF MAGISTRATE(1)

DATE: October 15, 1991

1) See Federal Rules of Criminal Procedure rules 3 and 54.

DJO:sgm   REC:   DETENTION (ALL DEFENDANTS)

EXHIBIT A

I. <u>OBJECTS OF THE CONSPIRACY</u>

Beginning on or about an unknown date and continuing to on or about October 11, 1991, in Los Angeles County within the Central District of California, and elsewhere, defendants ABRAM EGYAZAROV, EUGENE SLUSKER, MARK SERTICH and SAMUEL LEHTZER, and others known and unknown, knowingly combined, conspired and agreed to defraud the United States Treasury Department, Internal Revenue Service, a department and agency of the United States, by impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of the revenue: that is, federal diesel fuel excise taxes; and did further agree together and with each other to violate the laws of the United States by knowingly and willfully attempting to evade and defeat the federal diesel fuel excise tax due and owing to the United States on the sale of diesel fuel.

II. <u>OVERT ACTS</u>

In furtherance of the conspiracy and to accomplish the object of the conspiracy, defendants committed various overt acts within the Central District of California and elsewhere, including but not limited to the following:

1. On or about August 1, 1991, defendant SLUSKER paid Sarkis Parsegian $50,000 for a petroleum distribution company in Central California referred to as the Central California Facility.

2.    On or about September 1, 1991, LEHTZER caused one or two loads of fuel to be delivered to a confidential informant's ("CI's") a petroleum distribution company in Central California (the "Central California facility").

3.    From approximately September 1, 1991 through October 10, 1991, EGYAZAROV and SERTICH spoke with the CI on a nearly daily basis to ascertain the status of the Form 637 application the CI had submitted to the IRS.

## A F F I D A V I T

I, Denita Jackson, hereby depose and declare as follows:

1. I am a Special Agent (SA) with the Internal Revenue Service, Criminal Investigation Division (IRS CID) and have been so employed for nine years. During the course of my employment as an IRS CID SA, I have participated in over ten multi-defendant investigations for violations of federal tax laws, including several investigations relating to violations of federal excise tax laws. I am the IRS CID case agent assigned to the case <u>United States v. ABRAM EGYAZAROV, et al</u>.

2. This affidavit is made in support of a complaint against ABRAM EGYAZAROV (EGYAZAROV), EUGENE SLUSKER (SLUSKER), MARK SERTICH (SERTICH) and SAMUEL LEHTZER (LEHTZER) for violation of Title 18, United States Code, Section 371 (Conspiracy) by conspiring to commit a violation of Title 26, United States Code, Section 7201 (Tax Evasion). This affidavit is also made in support of search warrants to search the items described in paragraphs seven through nine of this affidavit, inclusive of all subparagraphs.

3. In the course of my training and experience with respect to federal excise tax investigations, I have learned the following information:

   a. Internal Revenue Code Section 4091(b) imposes a federal excise tax of $.201 per gallon on the sale or use of diesel fuel by a producer/wholesaler or importer. Form 637 is a document issued by the Internal Revenue Service which enables an entity to purchase diesel fuel "free" of federal excise tax. The Internal

1

Revenue Service typically issues the Form 637 to entities such as wholesalers, refineries, farm users, and construction building users, users that typically use the diesel fuel in an off-road capacity. Federal excise tax must be included in the price of diesel fuel sold to entities who do not have a Form 637.

   b.  Evidence obtained during recent criminal investigations of individuals involved in the gasoline/diesel fuel industry revealed schemes referred to as "daisy chains." In a typical "daisy chain," a distributor/wholesaler (Company A) purchases tax free diesel fuel utilizing a legitimate Form 637 issued by the IRS. Company A then sells this diesel fuel to an entity holding a fraudulent Form 637 (Company B). By having a fraudulent Form 637, Company B does not pay the federal excise tax on the diesel fuel. Company B will then sell the diesel fuel to either other entities holding fraudulent Form 637s (Companies C, D, etc.) or directly to diesel fuel retailers. These diesel fuel retailers will then pay Company B (or Companies C, D, etc.) the federal excise tax for the diesel fuel. Company B will typically charge these diesel fuel retailers a significantly discounted price for the diesel fuel compared to prices offered by legitimate diesel fuel wholesalers. Company B (or Companies C, D, etc.) would then be expected under the law to pay over this federal excise tax received from the diesel fuel retailers to the IRS.

   c.  In the "daisy chain" scheme, Company B (or Companies C, D, etc.) does not pay this federal excise tax to the IRS. Instead, Company B keeps this money designated by the diesel fuel

retailers for federal excise taxes. When the IRS conducts an audit to determine whether federal excise taxes have been paid, Company B and its principals disappear (and are referred to as "burn" or "bust out" companies).

  d. Firms involved in "daisy chains" may transfer diesel fuel as often as five or six times among corporations or companies, creating complicated paper trails. As the transfers occur, the diesel fuel physically remains in the originating storage tanks. Transfer of "ownership" occurs only on paper.

  4. In September and October 1991, I spoke to a confidential informant (CI) with regards to this investigation. While I had not previously used this CI, I and other IRS and Federal Bureau of Investigation (FBI) agents were able in the investigation to corroborate the CI's information as being truthful and reliable. During my conversations with the CI, the CI told me the following:

  a. During December 1990, SLUSKER and EGYAZAROV contacted the CI to rent tank space for diesel fuel storage at the CI's Long Beach fuel storage company.

  b. In approximately February 1991, SLUSKER and EGYAZAROV arrived to reclaim the diesel fuel they were storing at the CI's Long Beach storage terminal. When the CI informed SLUSKER and EGYAZAROV that the fuel was no longer there, SLUSKER and EGYAZAROV forced the CI at gunpoint (the gun was held to the CI's head) to sign documentation turning over the Long Beach storage terminal to EGYAZAROV. In addition, SLUSKER and EGYAZAROV stole from the CI his car, diesel tanker trucks, office furniture, and other office

equipment. I have viewed documentation which the CI provided to me that does in fact show the Long Beach storage terminal being turned over to EGYAZAROV.

    c. SLUSKER and EGYAZAROV used the CI's Long Beach storage terminal to store diesel fuel being used in SLUSKER and EGYAZAROV'S "daisy chain" scheme. During the course of this "daisy chain" scheme, the CI observed EGYAZAROV to possess at least five fraudulent Forms 637 with valid registration numbers that EGYAZAROV intended to use in other "daisy chain" schemes. These Forms are believed to be fraudulent in that they were used previous "daisy cahin" schemes. LEHTZER and SERTICH were also involved in these schemes. LEHTZER would take cash derived from the fuel sales to banks to convert into cashier's checks and paid the refineries for the fuel purchases. SERTICH was the accountant for the operation and would keep the books/records for the fuel sales and purchases.

    d. During July 1991, while working for another company (the CI was not working at the Long Beach storage terminal at this time), the CI met with SLUSKER. The CI informed SLUSKER that he was having financial problems and SLUSKER proposed that the CI work for him (SLUSKER) by "heading up" a petroleum distribution company in Central California (Central California facility) that SLUSKER was going to buy. SLUSKER told the CI that this company would already have a Form 637 to purchase diesel fuel without having to pay federal excise tax.

    e. On or about August 1, 1991, the CI met with SLUSKER and Sarkis Parsegian, the current owner of the Central California

4

facility. During this meeting, SLUSKER agreed that he would pay $50,000.00 to purchase the Central California facility. After SLUSKER paid Sarkis Parsegian for the Central California facility, SLUSKER arranged to have all documentation concerning the Central California facility to show the CI as the facility's president and owner.

f. From August 1, 1991 through August 15, 1991, the CI purchased diesel fuel "tax-free" for the Central California facility from legitimate diesel fuel refineries. At the direction of SLUSKER and EGYAZAROV, the CI fraudulently used the Form 637 issued to the prior owners of the company (Sarkis Parsegian). A Form 637 cannot be sold or "passed along" when a company changes ownership. The new owners must reapply when a company is purchased.) During this time, three loads of fuel were mistakenly diverted to truck stops not authorized by SLUSKER to receive fuel. When SLUSKER learned about these errors, SLUSKER met with the CI at a Long Beach office located at 200 East Pine Street, Suite 401, Long Beach, California (Long Beach office). During this meeting, SLUSKER hit the CI several times in the head with a gun relative to the mistaken fuel diversion errors. EGYAZAROV also hit the CI in the face with his fist relative to these errors.

g. On or about the middle of August, 1991, the CI was informed by the diesel fuel refineries he was purchasing diesel fuel from that they were aware that the Form 637 being used by the Central California facility was not legitimate and that they would no longer sell fuel tax-free to that company. Furthermore, the

5

refineries confiscated prepayment funds made by the Central California facility as payment for federal excise tax due on previous purchases.

 h. On or about the middle of August, 1991, SLUSKER and EGYAZAROV told the CI to submit a Form 637 application to the IRS in order to get another Form 637. SLUSKER and EGYAZAROV told the CI that if the CI did not get the Form 637 approved, he should "get his ex-wife to set a date for the funeral."

 i. On or about September 1, 1991, LEHTZER caused one or two loads of fuel to be delivered to the CI's Central California company. These loads were to be sold at a price which did not included federal excise tax. LEHTZER attempted to create documents disguising the sale. LEHTZER advised the CI that the documents should show that the fuel was delivered to a diesel fuel retailer as opposed to the Central California facility. Due to a clerical error, the attempt to disguise the documents involved in the transaction was not successful. In fact, the Central California facility company did appear as the purchaser of the fuel, but the price of diesel fuel received during this transaction did not include Federal excise tax.

 j. From approximately September 1, 1991 through October 10, 1991, EGYAZAROV and SERTICH spoke with the CI on a nearly daily basis to ascertain the status of the Form 637 application the CI had submitted to the IRS. I have been apprised by FBI SA Timothy Parker of consensually monitored telephone conversations between the CI and EGYAZAROV and SERTICH, recorded between September 30,

1991 through October 10, 1991, that corroborate the information provided by the CI.

5. On October 10 and 11, 1991, I learned through discussions with the CI, discussions with FBI SA Timothy Parker and other IRS CID SA and FBI SA, and listening to taperecordings of conversations between the CI and SLUSKER, EGYAZAROV, SERTICH, and LEHTZER, the following information:

    a. On October 10, 1991, the CI telephoned EGYAZAROV and SERTICH and told them that the CI had received a Form 637 from the IRS in San Jose, California, for the Central California facility. This telephone call was consensually monitored. Once the CI apprised EGYAZAROV and SERTICH about the Form 637, they were audibly elated. EGYAZAROV told the CI that EGYAZAROV would get a bottle of cognac and instructed the CI to "come in tomorrow" (indicating the Long Beach office). SERTICH was heard to exclaim "Oh boy, oh boy, oh boy.

    b. On October 11, 1991, the CI, who was wearing a body recorder and transmitter, took the Form 637 to the Long Beach office controlled by EGYAZAROV, SLUSKER, SERTICH and LEHTZER. Early in the conversation, EGYAZAROV told the CI that the CI would be involved in "big deal." EGYAZAROV told the CI that the CI's company in Central California would act as a wholesaler and purchase diesel fuel tax free. (The description of the role for the Central California facility was consistent with the operation of a "daisy chain" scheme.) EGYAZAROV told the CI that "I show you another 637 for another company -- not for yourself -- you be

7

wholesaler." EGYAZAROV told the CI that he personally has possession of the Form 637. EGYAZAROV stated "the other -- he be responsible for tax, not you." EGYAZAROV stated that "I make it safe for you." EGYAZAROV told the CI that "everything I decide -- you self -- you can decided nothing."

    c.  On two occasions during the October 11, 1991, monitored conversation, EGYAZAROV threatened the CI's life. Early in the conversation, EGYAZAROV told the CI, "If you make another time wrong, I kill you. Trust me, believe me." Later, EGYAZAROV told the CI, "If something wrong, you get bullet in head. If something wrong be terrible." EGYAZAROV further stated, "I fuck this business. I fuck everything and I fuck you right away."

    d.  Later during the October 11, 1991, monitored conversation, SLUSKER was heard entering the office. A short time later, SLUSKER was overheard asking the CI "What is that box over there -- what is that shit." SLUSKER also stated, "Can I see it." The CI later advised that SLUSKER had discovered the transmitter, which was hidden on the CI's leg, and had disconnected it. Federal law enforcement agents quickly entered the office and arrested EGYAZAROV and SLUSKER.

    e.  The CI advised that prior to federal law enforcement agent's entering the October 11, 1991 meeting but after the wire was discovered on the CI, EGYAZAROV, SLUSKER, SERTICH and LEHTZER retrieved four briefcases located in the Long Beach office. SERTICH and LEHTZER took these briefcases and left the office. SERTICH and LEHTZER were arrested minutes later on the roof of the

adjoining parking garage next to a white Toyota Corolla. Three briefcases matching the descriptions of the briefcases the CI saw in the Long Beach office were recovered from the front seat of the white Toyota Corolla and the fourth briefcase (also matching the CI's description) was recovered on the lid of the white Toyota Corolla's trunk.

6.  On October 12, 1991, at approximately 3:35 p.m., I presented an affidavit in support of a finding of probable cause to Magistrate Judge Charles Eick. The text of that affidavit is identical to this affidavit in support of the complaint and search warrant with the exception of paragraph number two and the addition of paragraphs six through ten. Magistrate Judge Eick issued a finding re probable cause at approximately 3:45 p.m. which is attached hereto as exhibit 1.

7.  During the course of this investigation, I have been told by SA Parker that he observed or received information that on more than one occasion EGYAZAROV, SLUSKER, SERTICH and LEHTZER drove their respective vehicles into the parking structure at the First Interstate Bank Tower where the arrests occurred. Subsequent to the arrests, I observed the following vehicles in the parking structure which were impounded and indicate their respective driver's below.

    a.  A white Toyota Corolla with no license plate, Vehicle Identification number 1N4(Y?)AE94A4H12200998, driven by LEHTZER.

    b.  A grey 1990 Nissan Pickup Truck, California license

9

plate #4C31918, Vehicle Identification number 1N6SD11S0AC420375 driven by SERTICH.

  c. A navy blue 1987 BMW, model 795i, four door, California license plate 2JJD244, Vehicle Identification number WBAGB43IXJ3205231, driven by EGYAZAROV.

  d. A black 1988 Mercedez, model 420 SEL, four door, California license plate 2VFZ928, Vehicle Identification number WDBCA35D7JA401966.

  8. The four briefcases were also seized and are currently in the custody of the Federal Bureau of Investigation evidence vault at 11000 Wilshire Boulevard, Los Angeles, California. They are described as follows:

  a. One maroon "Mesace" briefcase taken from the top of LEHTZER's Toyota Corolla.

  b. One black briefcase with two combination locks on the top discovered on the front passenger seat of LEHTZER's Toyota Corolla.

  c. One dark burgundy briefcase with two combination locks on each side discovered on the front passenger floor area of LEHTZER's Toyota Corolla.

  d. One brown "beaten up," unzipped portfolio, located on the front passenger floor area of LEHTZER'S Toyota Corolla.

  9. The office suite in which EGYAZAROV and SLUSKER were arrested is described as Suite 401, 400 Pine Street, Long Beach, California, on the fourth floor of a six-story commercial building of cinder block and glass construction located at the intersection

of Pine Street and Broadway on the south side of Pine and the east side of Broadway.

10. Based upon the information I have gathered above, I believe that a search of the suite, briefcases and vehicles may reveal the presence of the items indicated in the two-page document entitled attachment sheet #2 which is attached hereto as exhibit 2.

                                                    Denita Jackson
                                                    Special Agent
                                                    IRS CID

Sworn and subscribed to before me on this ___11___ day of October, 1991.

_____
UNITED STATES MAGISTRATE JUDGE

## FINDING RE PROBABLE CAUSE

On <u>10-12-91</u>, at <u>3:45 p.m.</u>, Agent <u>Denita Jackson</u> of the
    [date]        [time]             [name]

Internal <u>Revenue Service</u> appeared before me regarding the probable cause
    [agency]

arrest of defendant(s) <u>ABRAM EGYAZAROV, EUGENE SLUSKER, MARK SERTICH, AND SAMUEL LEHTZER</u> occurring
                            [name(s)]

at <u>10-11-91 at 1:15 p.m.</u>, at <u>Long Beach, California</u>.
   [date and time]          [place]

Having reviewed the agent's statement of probable cause, a copy of which is attached hereto, the Court finds that there **exists**/~~does not exist~~ probable cause to arrest the defendant(s) for a violation of <u>18 U.S.C. 371</u>.
                                                   [statute]

/✓/ It is ordered that defendant(s) <u>ABRAM EGYAZAROV, EUGENE SLUSKER, MARK SERTICH, SAMUEL LEHTZER</u>
                                                      [name(s)]

be held to answer for proceedings under Federal Rule of Criminal Procedure 5 / 40 on <u>10-15-91</u>.
                                               [date]

/___/ It is ordered that defendant(s) _____
                                                   [name(s)]

be discharged from custody on this charge forthwith.

DATED: October 12, 1991

TIME: <u>3:45 p.m.</u>

                                                         [signature]
                                        UNITED STATES MAGISTRATE JUDGE

EXHIBIT 1

ATTACHED SHEET #2

PROPERTY TO BE SEIZED

I.  The following documents, records and equipment, whether in the form of printed documents or stored in computer memory or on computer storage discs or on other computer storage mediums:

   A.  Any and all sales journals (and/or summaries), sales invoices, purchase journals (and/or summaries), purchase orders, bills of lading logs, bills of lading, accounts receivable journals, accounts payable journals, purchase invoices (and/or receipts), general ledgers, general journals, transportation records (including delivery tickets), throughput agreement, cash disbursements journal, bank statements (all bank accounts), canceled checks (all bank accounts), check registers (all bank accounts), cash receipts journals, cash deposit tickets (all bank accounts), corporate outfits (including minutes of meetings, certificate(s) of incorporation, stock certificates, etc.), payroll records, all correspondence records and files relating to the above-mentioned accounting records, any state or federal motor fuel tax returns and attachments and schedules thereto, records reflecting the importation, purchase, sale, transfer, ordering transportation or delivery of motor fuel and/or petroleum related products used to make "blended product.

   B.  Assets derived from the sale of gasoline, including United States currency, foreign currency, precious stones and metals, as well as checks, money orders, letters of credit, promissory notes, bonds and other writings evidencing value.

   C.  Bank records reflecting transactions involving the proceeds of this gasoline enterprise including but not limited to, passbooks, savings and checking account statements, canceled checks, deposit and withdrawal tickets, bank receipts, bank identification cards, wire transfer receipts, safe deposit box records, identification cards and keys.

   D.  Ledgers, desk and pocket calendars, message pads and message books, diaries, notebooks, telephone and address books and other writings reflecting meetings appointments, conversations with other individuals involved.

   E.  Contracts, agreements, notes and other writings evidencing an intention to purchase motor fuel distribution companies.

EXHIBIT 2

F.  Information contained in or produced or derived from computers, including keyboard, monitor, disk drives, printers, modems, and cables used to record or access computer records, computer storage discs and other computer storage mediums; telephone answering machines, telex and teletype terminals, electronic counter intelligence equipment, paper shredders, typewriters, tape recorders and equipment used in conjunction with same. (Alternatively, if the information cannot reasonable be extracted or retrieved from said equipment at the search location, the seizure of said equipment itself is requested.)